UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

DEAN EMMING and
CARRIE EMMING,                                    Case No. 09-22351-dob
                                                  Chapter 12 Proceeding
                 Debtor.                           Hon. Daniel S. Opperman
_____/
ROSEBUSH SALE BARN, INC.,

          Plaintiff,

v.                                                Adversary Proceeding
                                                  Case No. 09-2116-dob
DEAN EMMING,

          Defendant.
_____/

OPINION ON COMPLAINT TO DETERMINE DISCHARGEABILITY
UNDER 11 U.S.C. § 523 (a)(2)(A)

          Plaintiff filed this adversary proceeding seeking a determination that its claim against

Defendant is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).  Defendant Dean Emming

answered on January 5, 2010, denying the allegations.  The Court conducted a trial of this matter

on December 20, 2010.  After the conclusion of proofs, the parties requested the right to submit

post-trial briefs in lieu of closing arguments.  The Court granted that request and took this matter

under advisement.  After reviewing all the pleadings and evidence, considering the testimony of

all the witnesses and arguments of counsel, the Court finds that Plaintiff has not met its burden

under Section 523(a)(2)(A) and, therefore, holds that Plaintiff's claim against Defendant is not

excepted from discharge.

1

<u>Findings of Fact</u>

Plaintiff Rosebush is an auctioneer of dairy cattle and is owned by Mr. Robert Filhart. Plaintiff conducts regular auctions at which it requires successful bidders to pay on the day of the auction unless other arrangements are made. Plaintiff at times would extend credit to a buyer by holding a check for a short period of time or accepting a post-dated check. This extension of credit was not uncommon where a buyer was awaiting a "milk check".[1]

Defendant is a dairy farmer conducting business as Emming Dairy. Prior to participating in any auctions conducted by Plaintiff, Defendant entered into several loan agreements with Northstar Bank. Some loans were to consolidate other pre-existing loans and others had a specific purpose such as to purchase cattle or essentials for the farm. Each loan agreement included language, in bold, capital letters, on the first page of the agreement stating that oral approvals to loan money were unenforceable.

When seeking and obtaining loans through Northstar, Defendant would contact the bank and it would compile the necessary documents, such as loan applications and closing papers. Defendant would sign and date not only the application but also the closing documents on the same day. At some point in early 2009, Northstar declined to fund further loans for Defendant. However, Northstar worked on Defendant's behalf to obtain loans from the Farm Service Agency ("FSA"), including compiling the necessary documents for Defendant's loan

---

[1] Dairy producers are typically paid twice a month for their product. In this industry, all parties understand this payment schedule creates cash flow challenges and opportunities. Accordingly, many refer to the payment as a "milk check" and schedule payment of debts on the receipt of this payment.

2

applications to the FSA. Northstar worked with Defendant in this manner to help Defendant reorganize and restructure his existing obligations to Northstar.

In the months preceding his attendance at Plaintiff's auctions, Defendant experienced significant financial struggles, especially a drop in milk prices, which caused Defendant to miss payments on certain loans obtained from FSA. Defendant sought and received deferrals from FSA on loan payments during 2008 and into 2009 due to these struggles.

On December 10, 2008, Defendant attended his first auction conducted by Plaintiff. Prior to the auction, Defendant approached Mr. Filhart about the possibility of Plaintiff holding a payment check. The reason for holding the check is not entirely clear. Defendant either told Mr. Filhart he had money coming in from Northstar or Mr. Filhart simply "assumed" that Defendant was waiting on a "milk check." Regardless, Mr. Filhart agreed to hold Defendant's check until December 17, 2008. Defendant then successfully bid on 9 cows for a total purchase price of $15,800. As of the date of the auction, Northstar had not approved Defendant's loan. However, Northstar approved the loan on December 11, 2008, and closed the loan on December 19, 2008. Defendant's check to Plaintiff cleared when presented for payment.

Ten days later, on December 29, 2008, Defendant signed an application for a loan through the FSA. As it normally did, Northstar filled out the application for Defendant. However, the purpose of that loan was meant to pay for farm necessities and real estate improvements, not to purchase any cows. Defendant withdrew that application on January 20, 2009, after FSA informed him, via Northstar, that it likely would deny the loan request. Defendant withdrew the application rather than have FSA officially deny the loan.

3

Defendant next attended an auction conducted by Plaintiff on January 14, 2009. Defendant successfully bid on 24 cows at this auction for a total price of $26,350, plus $260 in transportation costs. While it is disputed exactly what Defendant told Mr. Filhart regarding the status of another loan from Northstar to fund the purchase, following the auction Mr. Filhart granted Defendant a second extension of credit. Plaintiff accepted a check post-dated to January 31, 2009, as payment for Defendant's bid. Although Defendant knew at some point after the sale that no loan from Northstar would be funded by January 31, Defendant did not inform Plaintiff of this. Despite being presented twice, Defendant's check did not clear.

The final auction Defendant attended pre-petition was held by Plaintiff on March 27, 2009, in Kinde, Michigan. By this time, Northstar told Defendant it would not fund further loans. Northstar did, however, continue working with Defendant to obtain loans through the FSA to refinance Defendant's existing loans with Northstar. Defendant understood that Mr. Ed Tschirhart, the loan officer from Northstar assisting Defendant, was working with Mr. Steve Craig, a loan officer with FSA, to obtain financing. On March 19, 2009, Defendant signed an application completed by Northstar for a $130,000 loan through FSA, a portion of which was to be used to pay off the January 14 purchase and fund the a purchase at the upcoming March 27 auction. Again, it is disputed exactly what Defendant told Mr. Filhart or another employee of Plaintiff regarding the status of any loan, but Defendant did speak to Mr. Filhart minutes before the auction began and obtained approval to bid for cows. Defendant successfully bid for 9 cows, totaling $13,750. Plaintiff never received payment from Defendant for those cows. Thus, with accumulated interest, Defendant owed Plaintiff a total of $46,106.14 as of November 30, 2010.

4

Additional facts developed from the Trial will be referenced, as well as the resolution of disputed portions of testimony, in later sections of this Opinion.

<u>Jurisdiction</u>

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

<u>Conclusions of Law</u>
<u>Applicable Law</u>

Section 523(a)(2)(A) excepts from discharge "any debt –

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Section "523(a)(2)(A) identifies three distinct triggering events," false pretenses, false representation, or actual fraud, "each constituting a different overt manifestation of the same sort of deceptive animus."  *Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D. Minn. 1995) (citations omitted).  "Nondischargeability under § 523(a)(2)(A) requires a showing of some conduct by the debtor which can be fairly said to be 'blameworthy.'" *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003) (citation, internal quotation marks, and alterations omitted).

To prevail under Section 523(a)(2)(A), Plaintiff has the burden to prove the following elements:

(1) the debtor made false representations [to obtain the extension of credit];

5

(2) the debtor knew such representations to be false at the time they were made;
(3) the representations were made with the intent to deceive the creditor;
(4) the creditor relied on the representations; and
(5) the creditor's loss was the proximate result of the misrepresentation having been made.

*Kille v. Rudski (In re Rudski)*, 357 B.R. 121, 125 (Bankr. N.D. Ohio 2006) (citing *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir.1998)).  The objecting "'creditor must prove each of these elements by a preponderance of the evidence.  Further, exceptions to discharge are to be strictly construed against the creditor.'"  *Abdel-Hak v. Saad (In re Saad)*, 319 B.R. 147, 153 (Bankr. E.D. Mich. 2004) (quoting *Rembert*, 142 F.3d at 281).

"For the purposes of § 523(a)(2)(A), false representations and pretenses encompass statements that falsely purport to depict current or past facts.  False pretense involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a false representation which is an express misrepresentation."  *Copeland*, 291 B.R. at 760 (citations and internal quotation marks omitted).  "A false pretense has been defined to include a 'mute charade,' where the debtor's conduct is designed to convey an impression without oral representation."  *Germian Lincoln Mercury of Columbus, Inc. v. Begun (In re Begun)*, 136 B.R. 490, 494 (Bankr. S.D. Ohio 1992) (citations omitted).

"'[A]ctual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions.'"  *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (citing *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000)).  "Actual fraud consists of any deceit, artifice, trick, or design involving direct and active

6

operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Copeland*, 291 B.R. at 760 (citation and internal quotation marks omitted). However, "[t]he elements of actual fraud are slightly different from those needed to prove a false representation, which is the basis for many § 523(a)(2)(A) cases." *JGR Assocs., LLC v. Brown (In re Brown)*, 442 B.R. 582, 601 (Bankr. E.D. Mich. 2011). "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud . . . ." *Vitanovich*, 259 B.R. at 877.

With respect to the intent to deceive, "[i]t is often difficult to determine a debtor's true intent. No debtor is going to get on the stand and admit to fraudulent intent." *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001). Thus, the "intent to defraud under § 523(a)(2)(A) is determined under a subjective standard, requiring the plaintiff to show that the debtor did not actually intend to perform those obligations promised." *Wilhelm v. Finnegan (In re Finnegan)*, 428 B.R. 449, 453 (Bankr. N.D. Ohio 2010) (citing *Rembert*, 141 F.3d at 281). "[W]ith the subjective intent of a debtor at issue, . . . of utmost importance in any fraudulent intent analysis is the credibility the Court attaches to the testimony of the debtor and any other witnesses called to testify." *Rudski*, 357 B.R. at 126 (citation omitted).

Whether Plaintiff relied on Defendant's alleged misrepresentations requires an inquiry into whether Plaintiff's "reliance is justifiable," and "is also subjective, based on the facts and circumstances surrounding each individual case." *Copeland*, 291 B.R. at 766-67 (citation

7

omitted).  "A logical prerequisite for justifiable reliance is a showing by the creditor that it

'actually relied' and that its reliance was then justifiable."  *Id*. at 767 (citation omitted).  "[T]he

Plaintiff is not required to demonstrate that the falsity of the representation was so well crafted as

to be virtually undetectable.  Reliance may be 'justifiable' even though an investigation would

have revealed the falsehoods."  *Capp Equities, LLC v. Christine (In re Christine)*, 429 B.R. 882,

887-88 (Bankr. W.D. Mich. 2010) (citing *Field v. Mans*, 516 U.S. 59, 69 (1995)).

<u>Analysis</u>

Plaintiff must demonstrate by the preponderance of the evidence that Defendant made

material, deceptive misrepresentations knowingly, or with reckless disregard for the truth of the

representations, with the intent to deceive Plaintiff and that it justifiably relied on those

representations when extending credit.  It is not disputed that Defendant obtained credit from

Plaintiff.  Defendant did not have to pay for the cows he bid for on the day of the auction, as was

typically required.  Thus, the threshold statutory requirement is met here.  Furthermore, leaving

aside the other elements, the Court finds that there is a direct link between Plaintiff's loss and

Defendant's alleged misrepresentations.  Therefore, the fifth element of Section 523(a)(2)(A) is

also met.  *See Copeland*, 291 B.R. at 740 (citation and internal quotations marks omitted) (to

find proximate cause "there must be a direct link between the alleged fraud and the creation of

the debt").  The remaining issues are whether Defendant knowingly misrepresented that he had

been approved for loans to pay for the cows he successfully bid on, made the representation with

the intent to deceive Plaintiff, and Plaintiff justifiably relied on Defendant's representation.  As

discussed below, the Court finds that Plaintiff has not met its burden on these elements in several

8

respects.

A.    *False Representation, False Pretense, or Actual Fraud*

Plaintiff must first prove that Defendant obtained credit through either false representations, false pretenses, or actual fraud.  Plaintiff argues in its post-trial brief that each of these triggering events is present here.  Plaintiff argues that Defendant misrepresented the status of the loans he was seeking.  Plaintiff points to testimony from Mr. Filhart and Ms. Yvonne Neyer, Plaintiff's bookkeeper, that Defendant told them he was approved for a loan and the funds would be disbursed within a week of the respective auction.  Plaintiff further argues Defendant failed to disclose material facts, such as Northstar's denial of his December 29, 2008, loan application and that he was delinquent on FSA loans.  Defendant opposes by arguing the evidence does not support a finding that he made any false statement.  Defendant contends he only made statements believed to be true at the time.

While Plaintiff claims Defendant's statements or omissions fall under false representations, false pretenses, and actual fraud, the Court finds that each are best understood as objectively false representations.  Plaintiff's main focus is on what Defendant told Plaintiff regarding the status of his respective loans.  That is, that Defendant materially misrepresented the status of the loans.  At trial, Mr. Filhart testified that at the January 14 and March 27 auctions, Defendant stated he was "approved" for a loan that would be funded within a week of the auctions.  Ms. Neyer also testified that prior to the January 14 auction Defendant told her he applied for a loan, was approved, and the loan would be funded shortly.  Ms. Neyer similarly testified about the March 27 auction, that Defendant said there was a delay in funding his loan

9

and Defendant expected the funds within one week.

Defendant, on the other hand, testified at trial that the typical loan process with Northstar involved many oral representations.  Defendant testified that, based upon his past experience with Northstar, he simply called Northstar requesting a loan, and Northstar would begin working on the loan application.  Defendant did not physically complete any loan application.  Northstar completed the preliminary paperwork and the closing documents on his behalf.  Plaintiff's exhibits reflect this fact as the documents, both application and closing, for any given loan were all signed on the same day.  Defendant also testified that Mr. Tschirhart orally told him to attend the January 14 auction to purchase cows.  Defendant also confirmed his deposition testimony that Mr. Tschirart told him to bring the invoice to the bank, and Northstar would pay the invoice or "would make it right."  Defendant further confirmed prior deposition testimony that he told Plaintiff he "was in the process of getting a loan[.]"  Defendant further agreed with his deposition testimony that Mr. Tschirhart "told me to go get the cows, that was my approval."  At trial, Defendant repeated that, "Ed Tschirhart was the one that told me to . . . go and get the cows," and that, "Ed told me to get the cows," and that Mr. Tschirhart "said some way we'll . . . work out a deal, we'll get it done."

With respect to the March 27 auction, Defendant testified that he had not in fact gotten approval for the $130,000 FSA loan Northstar applied for on his behalf on March 19.  However, similar to January 14 auction, Defendant testified that Mr. Tschirhart "told me" he had "talked to the FSA [and] they're going to get it done."  Defendant testified he told Mr. Filhart, "that's what I was waiting for . . . the loan to come through the FSA."  Defendant further testified that

10

although he was not approved, "they [Northstar] told me it was going to go." Defendant acknowledged that he did not inform Mr. Filhart that he had only applied for the FSA loan, that the December 29, 2008, loan application to FSA through Northstar had been denied, or that he had missed payments and had been in deferred status on FSA loans. However, on cross-examination, when asked whether, since 2007, he "always [had] been told orally [by Northstar] to proceed" to buy cows and then, once the paperwork was ready, he would sign the documents, Defendant answered affirmatively.

The Court finds that the Defendant's representations to Mr. Filhart and Ms. Neyer were false when they were made, thus satisfying the first element of Section 523(a)(2)(A). "[F]alse representations . . . encompass statements that falsely purport to depict current or past facts" and "a false representation . . . is an express misrepresentation." *Copeland*, 291 B.R. at 760. Both Mr. Filhart and Ms. Neyer testified that Defendant told them he had been "approved" for a loan and it would be funded within a week. Defendant admitted at trial, however, that in fact he was not approved for any loans at the time of the auctions. Defendant had not actually applied for any loan at the time of the January 14 auction and had only recently applied for a loan as of the March 27 auction. While Defendant confirmed his deposition testimony that he told them he was in the process of obtaining loan approval, he also testified at his deposition that he could not remember what he told Mr. Filhart or Ms. Neyer. However, Defendant was adamant at trial that Mr. Tschirhart told him prior to each auction to go and participate. Whether Defendant believed he was in fact approved, that is whether he knew his representations were false in light of previous practices, is not a consideration of this element. The Court agrees that "there is no

knowledge requirement within the first element of § 523(a)(2)(A) – that [Defendant] may not have understood that he had made a misrepresentation is simply not germane." *De La Cruz v. Cohen (In re Cohen)*, 191 B.R. 599, 605 (D.N.J. 1996), *aff'd* 106 F.3d 52 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998). To the extent Defendant represented he was "approved" for loans, from an objective perspective the statements falsely depicted current or past facts and were express misrepresentations.

In arriving at this finding the Court did not, as urged by Plaintiff, draw an adverse inference from the fact that Defendant did not call Mr. Tschirhart to testify. The Court interprets this as Plaintiff requesting the Court to apply the so-called "missing witness" or "uncalled witness" rule to find that Mr. Tschirhart's testimony would have been damaging to Defendant. "An adverse inference is permitted from the failure of a defendant to call witnesses if they are 'peculiarly within (his) power to produce' and if their testimony would 'elucidate the transaction.'" *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973) (citation omitted). However, "[m]ost courts have carefully restricted application of the 'uncalled or missing witness' rule to situations where both of these elements are present." *Id.* (citation omitted). In fact, "the analysis must be 'strictly applied.'" *United States v. Frost*, 914 F.2d 756, 765 (6th Cir. 1990) (quoting *Blakemore*, 489 F.2d at 195). The Court finds that the first element, that Mr. Tschirhart was particularly within the power of Defendant to call, is not met here. "The general rule is that no such inference may be drawn by [the factfinder] because a party fails to call as a witness one who is in a legal sense a stranger to him and is equally available to the other side." *Blakemore*, 489 F.2d at 196 n.4 (citation and internal quotation marks omitted). Mr. Tschirhart

12

is a loan officer at Northstar and therefore is legally a stranger to Defendant. Moreover, it is significant that Plaintiff, not Defendant, listed Mr. Tschirhart as a "will-call" witness for trial. Courts also refuse to apply the rule where each party has equal opportunity to subpoena the respective witness. *Frost*, 914 F.2d at 765. Because Plaintiff has failed to establish the applicability of the "missing witness" rule, the Court declines to draw the adverse inference that Mr. Tschirhart's testimony would not have supported Defendant.

Although Defendant made express and objectively false representations, the Court does not find that Defendant's omissions of purported relevant financial information rises to the level of a false representation. Plaintiff argues that Defendant did not tell it that he recently had a loan denied by Northstar, that he was delinquent on payments to FSA, or that other loan payments were deferred due to financial struggles. Plaintiff correctly notes that under certain circumstances, "concealment of material fact can itself constitute a misrepresentation." *Saad*, 319 B.R. at 154 (citing *Rowe v. Steinberg (In re Steinberg)*, 270 B.R. 831, 835 (Bankr. E.D. Mich. 2001). "A condition to invocation of the doctrine, however, is that there be a duty to make disclosure." *Steinberg*, 270 B.R. at 835 (examining duty to disclose in the context of Michigan's seller's residential home disclosure). "Generally, absent a duty imposed by law to disclose facts because of a peculiar relationship of the parties . . ., mere silence and failure to disclose falls short of establishing a false representation." *Castro v. Zeller (In re Zeller),* 242 B.R. 84, 87 (Bankr. S.D. Fla. 1999).

Plaintiff argues Defendant had a duty to disclose various aspects of his financial condition to Mr. Filhart prior his decision on whether to hold checks or accept post-dated checks.

13

Plaintiff cites *FDIC v. Roberti (In re Roberti)*, 201 B.R. 614, 627 (Bankr. D. Conn. 1996), for the proposition that "[a] borrower has the duty to divulge all material facts to the lender and a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." (citation omitted). Any duty on Defendant "must be a legal or equitable duty to disclose in order for suppression of information to constitute silent fraud." *In re Matter of Embrace Systems Corp.*, 178 B.R. 112, 124 n.9 (Bankr. W.D. Mich. 1995) (citation omitted). In *Robterti*, the case Plaintiff relies on, the defendant misrepresented the name of the corporation applying for a loan, "an essential component to the loan transaction for the simple reason that a debt cannot be recovered from an entity which does not exist." *Roberti*, 201 B.R. at 627. Reliance issues aside for the moment, Plaintiff has not established a similar "essential component" in the same vein that put upon Defendant the legal (or equitable) duty to disclose the identified information. Plaintiff seems to demand a similar duty of disclosure one typically understands as being reserved for a more traditional bank or lending institution, such as Northstar or FSA. Yet, Mr. Filhart himself testified that Plaintiff was neither "a bank" nor "in the lending business" or "banking business." Plaintiff, who disavows being a lender or a bank, failed to show that Defendant had any legal or equitable duty to disclose under the circumstances. The Court does not find that Defendant's non-disclosure, notwithstanding hindsight claim of importance attached to those facts, is the type contemplated by the proposition that silence or concealment can constitute a misrepresentation.[2]

---

[2] In addition, even if Defendant did have a legal duty to disclose, the status of pending loans, denials of loans, delinquency, or deferred payments arguably are statements about Defendant's financial condition. Leaving aside the debate over how strictly or broadly to

Plaintiff also argues Defendant's statement about loan approval qualify as false pretenses or actual fraud. "False pretense involves implied misrepresentation or conduct intended to create and foster a false impression[.]" *In re Copeland*, 291 B.R. at 760. False pretense generally focuses on silence or conduct that gives a particular false impression. Usually it is in situations "where the debtor's conduct is designed to convey an impression **without** oral representation." *Begun,* 136 B.R. at 494 (emphasis supplied). "False pretenses [also] may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak[.]" *Ostertag v. Overall (In re Overall)*, 248 B.R. 146, 150 (Bankr. W.D. Mo. 2000) (citation and internal quotation marks omitted). Here, Plaintiff argues that Defendant expressed orally the misrepresentations. Under the foregoing, such statements are more appropriately addressed under false representations. Thus, the Court finds no basis for any finding of false pretenses.

Lastly, the Court finds that Defendant's statements do not suffice to show actual fraud. As noted, proving actual fraud differs from proving false representation or pretense. *JGR Assocs., LLC v. Brown*, *supra*. The evidence does not support a finding that Defendant engaged in any sophisticated scheme to cheat Plaintiff. Defendant's statements regarding the status of his loans need to be viewed in context. Defendant's uncontradicted testimony is that Mr. Tschirhart

---

interpret the term "financial condition," *see*, *e.g.*, *Armbrustmacher v. Redburn (In re Redburn)*, 202 B.R. 917 (Bankr. W.D. Mich. 1996), courts have held that oral statements of financial condition are outside Section 523(a)(2)(A) and instead fall under Section 523(a)(2)(B) – a claim not pled here. *See*, *e.g.*, *Prim Capital Corp. v. May (In re May)*, No. 06-8044, 2007 WL 2052185, at *5 (B.A.P. 6th Cir. July 19, 2007) ("All statements regarding a debtor's financial condition, whether written or oral, are expressly excluded from subsection (A)."). Thus, even if Defendant disclosed the information Plaintiff claims was relevant, it is clear such would not be actionable under Section 523(a)(2)(A), the only claim pled here.

told him to go the auctions to purchase cows and that the funds would be available to pay. Again, Mr. Tschirhart was not called to contradict Defendant's testimony. Defendant appears to have relied on rather loose past practices and dealings with Northstar that allowed him to purchase cows on an apparent line of credit. This line of credit is best exemplified by the circumstances surrounding the first auction Defendant attended. In that situation, Defendant applied for a loan shortly before the auction and requested that Plaintiff hold his check. Mr. Filhart assumed, without asking, that this was because Defendant was waiting on his "milk check." Defendant received approval and closed on the loan after the auction. Thus, from past practice Defendant believed he had loan approval when he attended subsequent auctions, based on the oral representations from Mr. Tschirhart, and represented that to Plaintiff. The context, therefore, does not support a finding of actual fraud that Defendant intentionally engaged in deceit or clever trickery to perpetrate a deception on Plaintiff. *In re Copeland*, 291 B.R. at 760.

B. *Knowledge of the Falsity*

Even though the Court has found that Defendant made objectively false representations, Plaintiff must also show that Defendant either had knowledge his representations were false when he made them or made them with gross recklessness. *Copeland*, 291 B.R. at 791. It can be inferred that Plaintiff's argument is that Defendant knew his representations were false because he understood he would not have the loan money until the loan was closed and the money disbursed. Plaintiff also expressly argues Defendant was grossly reckless by relying on oral statements from Mr. Tschirhart that Northstar would make things right or pay given the lack of formal approval. Defendant counters by arguing he believed his statements were true when he

16

made them.

When "assessing a debtor's knowledge of the falsity of the representation . . . [a c]ourt must consider the knowledge and experience of the debtor." *FTC v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994). Knowledge of the falsity can be established if: "(1) the representation was made with actual knowledge of its falsity; (2) it was made without knowledge either of its truth or falsity; or (3) the representation was made under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *Shaw v. Santos (In re Santos)*, 304 B.R. 639, 664 (Bankr. D. N.J. 2004) (citations omitted).

As discussed earlier, Defendant credibly testified that his prior dealings with Northstar entailed numerous oral assurances of loan approvals. Defendant testified that since 2007, he had always been told to proceed with purchases and then come in and sign after Northstar completed the paperwork. While Plaintiff may believe it "highly unlikely that a bank officer" such as Mr. Tschirhart would give Defendant "an open-ended commitment" to buy cows and the bank would pay or make it right, Defendant's testimony stands uncontroverted that Northstar "always" gave oral approvals and the paperwork followed at a later date. From the course of prior dealings, it is apparent Defendant honestly believed he obtained approval notwithstanding that the paperwork needed to be finalized. Again, the circumstances of the December 10, 2008, auction bear this out. Defendant had applied for a loan just days before the auction, went to the auction and asked Plaintiff to hold a check, the loan that funded the purchase was approved a day later, and the closing happened one week later, two days after Defendant asked Plaintiff to hold the check. As Mr. Filhart testified, Defendant "did exactly as he said he

would do[.]" Although there is a difference between being in the application process versus being formally approved awaiting disbursement, the circumstances of Defendant's prior dealings with Northstar reasonably led him to believe he could take Mr. Tshirhart at his word that he would be approved and the loan would be funded.

In light of Defendant's above knowledge and experience, it is clear he did not know his representations were false. Defendant had no actual knowledge that he was not approved because Mr. Tschirhart told him he was approved and to go get the cows. From Defendant's experience, this was tantamount to formal approval even though the paperwork was not finalized. Defendant did not know, at the time, that the loan status was any different than he represented to Plaintiff. *Palmacci*, 121 F.3d at 787 (lack of knowledge or belief that "the matter is not as [a defendant] represent it to be" shows falsity). Nor should Defendant ought to have known of the falsity. Defendant was not ignorant and had some knowledge that his assertion was true based on past experience. In other words, Defendant did not make "such absolute, unqualified, and positive assertion on a subject of which he was ignorant [or] that he had no knowledge whether his assertion in reference thereto was true or false." *Church v. Hanft (In re Hanft)*, 274 B.R. 917, 922 (Bankr. S.D. Fla. 2002), *aff'd in relevant part* 315 B.R. 617 (S.D. Fla. 2002) (citation omitted). From the course of prior dealings Defendant also had "confidence in the accuracy of his representation . . . ." *Palmacci*, 121 F.3d at 787 (citation omitted). Moreover, Defendant was not in any special position, nor possessed any means to know whether his representations were false. *Hanft*, 274 B.R. at 922. All the paperwork and communication occurred between Northstar and FSA. From Defendant's vantage point, the representation that

he was approved, or that he would be approved within days, was true. Defendant had an objective and verifiable "basis for his representation that he state[d] . . . ." *Palmacci*, 121 F.3d at 787 (citation omitted). Thus, Plaintiff has not sustained its burden to show that Defendant knew his representations were false when he made them.

Nor has Plaintiff shown that Defendant "acted with reckless disregard for the truth in making representations without confirming their accuracy." *Copeland*, 291 B.R. at 763. Reckless disregard is the "conscious indifference to the consequences of an act." *Id.* (citation and alterations omitted). " '[R]eckless disregard should be very narrowly interpreted." *Id.* (citation omitted). "An honest belief, however unreasonable, that the representation is true and that the speaker has information to justify it is an insufficient basis for deceit." *Palmacci*, 121 F.3d at 788 (citation omitted); *Copeland*, 291 B.R. at 763 (same). Contrary to Plaintiff's argument, it was not grossly reckless for Defendant to rely on Mr. Tschirhart's oral assurances of loan approval. The course of prior dealings provided Defendant a reasonable and honest basis for accepting and acting upon his statement and directives. Defendant had information justifying the representations. The Court is not convinced it was unreasonable for Defendant to believe such.

The Court also views the January 14 and March 27 auctions from a broader perspective. Stepping back, Defendant essentially promised to pay Plaintiff at a later date rather than on the day of the sale as Plaintiff generally required. In other words, Defendant simply made a promise to pay Plaintiff what he owed in the future. " 'A representation of the maker's own intention to do a particular thing is fraudulent if he does not have that intention at the time he makes the

19

representation.'" *Copeland*, 291 B.R. at 763 (quoting *Palmacci*, 121 F.3d at 786) (alterations omitted). However, "if, at the time [a debtor] makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation." *Palmacci*, 121 F.3d at 787 (citations omitted). Furthermore, "[a] debtor's statement of future intention is not necessarily a misrepresentation is intervening event cause the debtor's future actions to deviate from previously expressed intentions." *Id*. (citation omitted). Here, Defendant's testimony is clear that he had every intent to fulfill his promise to pay. Mr. Filhart also testified he "thought that [Defendant] intended to pay." However, intervening events – that is, the denial of the loans from both Northstar and FSA, after Defendant was told he should go buy the cows – caused the deviation in Defendant's intentions. Thus, there is no basis for finding that Defendant made a fraudulent representation when he had every intention of paying for the cows. For all of the above reasons, the Court holds that with respect to either the January 14 or March 27 auctions Plaintiff has not met its burden on this element.

     C.    *Intent to Deceive*

     The next element Plaintiff must prove is that Defendant intended to deceive. Plaintiff argues that "Defendant obviously intended to deceive" Plaintiff because he made a false representation. Defendant, on the other hand, argues he had no intent to deceive, as evidenced partially by his offer to return the cows he purchased. Plaintiff replies that Defendant's offer to return the purchased cows has no bearing on his intent to deceive.

     "[I]ntent to defraud under § 523(a)(2)(A) is determined under a subjective standard,

20

requiring the plaintiff to show that the debtor did not actually intend to perform those obligations promised." *Finnegan*, 428 B.R. at 453. The Sixth Circuit has held that "the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt." *Rembert*, 141 F.3d at 281. Because a defendant will rarely take the stand and admit to an intent to deceive, this Court "must consider whether the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." *Copeland*, 291 B.R. at 766 (citations and internal quotation marks omitted). While the Sixth Circuit has cautioned against simply "factor-counting," the use of certain factors can be helpful in determining a debtor's subjective state of mind. *Rembert*, 141 F.3d at 282. Factors considered by some courts are "the debtor's conduct after incurring the obligation, the debtor's financial sophistication, and whether debtor failed to undertake measures to perform their obligation." *Rudski*, 357 B.R. at 126 (citation and internal quotation marks omitted).

Plaintiff's evidence fails to show that Defendant did not subjectively intend to perform his obligations. First, the facts simply do not present a picture of deceptive conduct. Defendant testified he intended to repay Plaintiff with money from loans obtained from Northstar or FSA. Mr. Filhart likewise testified he thought Defendant intended to pay for the cows with the funds from the loans. Although Mr. Filhart assumed Defendant requested his check for the December 2008 auction be held because Defendant was waiting for a "milk check," Defendant testified that he told Mr. Filhart prior to that auction that he had money coming from Northstar and therefore requested Mr. Filhart hold his check for a couple weeks. Ultimately, Defendant's as then unapproved loan was approved, closed, and disbursed within nine days of the auction.

21

With respect to the January 14 auction, Defendant was in contact with Mr. Tschirhart regarding his loan request and was told to go get the cows. Based on earlier experience, Northstar would complete the loan documents later. The oral commitment by the bank and the circumstances surrounding the December auction gave Defendant a reasonable basis for bidding at the January auction fully intending and believing that Plaintiff would be repaid shortly. The Court does note that Defendant did not make alternate arrangements for payment until after he successfully bid at the January auction. However, Mr. Filhart agreed to let the cows go nonetheless and, despite Defendant's check bouncing twice, did not press the issue until the March auction.

As for the March auction, Mr. Filhart allowed Defendant to bid knowing Defendant had not yet paid for the earlier auction. While Mr. Filhart may have felt constrained in some fashion based on when Defendant sought permission to bid, he nevertheless allowed Defendant to bid. Mr. Filhart testified that Defendant told him funds to pay off the January auction plus what he bid at the March auction would be forthcoming within a week. Similar to previous occasions, Defendant again received oral assurance from Mr. Tschirhart that the FSA loan was "going to go." Believing the loan would come through, Defendant testified he told Mr. Filhart he was awaiting that funding to pay off both auctions. These facts are not those of deceptive conduct by a debtor. Defendant intended and fully expected to repay Plaintiff with the loan proceeds.

Second, Defendant's conduct after incurring his obligations to Plaintiff indicate a lack of intent to deceive. Even though Defendant withdrew his December 29, 2008, loan application because it would be denied, he thereafter received assistance from Northstar in trying to

obtaining a larger, refinancing loan from FSA. Defendant expected to use that loan to pay for the January and March auction purchases. Defendant also diligently endeavored after the March auction to secure financing to pay off his obligations to Plaintiff, including meeting with FSA twice in April of 2009 and agreeing to Northstar submitting a revision to the amount requested to secure approval. It was not until May 4, 2009, that this process failed.

Third, Defendant is not a financially sophisticated debtor. In making this observation, the Court means no disrespect to Defendant. Defendant consistently and credibly testified that he never filled out the loan application documents. He simply made oral requests for loans and then when all the paperwork was completed by Northstar he would sign the applicable documents. The picture that emerges is one of a financially struggling debtor receiving assistance from a bank who gave the debtor many loans and attempted to find alternative financing not only for the debtor, but also for the benefit of the bank in that its loans would be paid from refinancing at another financial institution. Lacking financial acumen, Defendant relied on and trusted Northstar when moving forward with purchases during an admittedly difficult financial time.

Lastly, there is evidence Defendant took measures to perform on his obligations. It is undisputed that Defendant sought to return some or all of the cows purchased on January 14. Mr. Filhart acknowledged on cross-examination that Defendant offered to return the cows a few weeks after the January auction. This comports with Defendant's testimony that after he learned that the loan he applied for prior to the January auction would be denied, and thus prompting Defendant's withdrawal of the application, he contacted Mr. Filhart in an attempt to return the

23

cows.  Mr. Filhart, however, testified he refused the offer to return the cows because he did not

understand the offer to be a 100% repayment of debt owed due to potential decreases in the

value of the cows.  Contrary to this testimony, Defendant testified that Mr. Filhart told him to

hold on to the cows on the chance things would turn around for Defendant.  Whether or not

Defendant could have actually returned the cows given Northstar's security interest (although

Defendant testified Northstar told him to return the cows), it is undeniable that Defendant took

measures to perform.  In the totality of the circumstances, the Court is not convinced the facts of

this case present a picture of deceptive conduct; rather, the picture painted is that of a debtor

trying to take affirmative steps to make good on his obligations once he realized he was

overextended and unable to obtain a loan.  Thus, for both the January 14 and March 27 auctions,

the Court holds that Plaintiff failed to prove by the preponderance of the evidence Defendant's

intent to deceive.

      D.    *Justifiable Reliance*

The final element Plaintiff must prove is that it justifiably relied on Defendant's

representations.  As with the intent to deceive inquiry, determining whether a creditor's reliance

is justifiable "is also subjective, based on the facts and circumstances surrounding each

individual case." *Copeland*, 291 B.R. at 766-67.  "Under this standard, a creditor will be found

to have justifiably relied on a representation even though 'he might have ascertained the falsity

of the representation had he made an investigation.'" *McCoy*, 269 B.R. at 198 (quoting *Field*,

516 U.S. at 70).  However, "justifiable reliance . . . depends on the qualities and characteristics

of the particular individual who relies on the particular representation." *Christine*, 429 B.R. at

888 (citing *Field*, 516 U.S. at 71). In other words, this "'subjective standard which takes into account the knowledge and relationship of the parties themselves.'" *Finnegan*, 428 B.R. at 456 (quoting *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.3d 1454, 1459 (9th Cir. 1992)). Thus, "if a person does have special knowledge, experience and competence he may not be permitted to rely on representations that an ordinary person would properly accept." *Id.*

Plaintiff argues it relied, and justifiably so, on Defendant's representations that he received loan approval when it permitted Defendant to pay at a later date for the cows he successfully bid on. Defendant's post-trial arguments do not appear to contest this element. The "logical prerequisite for justifiable reliance" is that Plaintiff actually relied. *Copeland*, 291 B.R. at 767. The Court finds that Plaintiff did actually rely on Defendant's representations. Mr. Filhart testified generally that but for Defendant's statements regarding loan approval he would not have agreed to hold checks or accept post-dated checks.

The Court finds Plaintiff had the requisite justifiable reliance with respect to the January 14 auction. As Mr. Filhart testified, his experience with Defendant up to that date was one of successful repayment as promised. He had no reason to question Defendant's representation of loan approval and imminent funding. Plaintiff "justifiably relied on a representation even though '[it] might have ascertained the falsity of the representation had [it] made an investigation.'" *McCoy*, 269 B.R. at 198 (quoting *Field*, 516 U.S. at 70). Mr. Filhart's knowledge and the relationship of the parties support the finding that Plaintiff justifiably relied on Defendant's representation.

25

However, the same cannot be said regarding the March 27 auction. By this auction Plaintiff had knowledge that despite Defendant's representation that the loan would be funded within a week, the check for payment of the January auction held by Plaintiff had bounced twice. Ms. Neyer testified she questioned Defendant about why Plaintiff should let Defendant bid for more cows given this fact. Moreover, Defendant testified that after he withdrew his loan application shortly after the January 14 auction, he contacted Mr. Filhart to discuss returning the cows purchased at that auction. Defendant testified he told Mr. Filhart he could not get the money and that he wanted to return the cows. The clear inference was that Defendant's loan was not approved. Defendant also testified without contradiction that Mr. Filhart told him to keep the cows on the chances things would turn around and get better. Mr. Filhart acknowledged that Defendant offered to return the cows purchased at the January 14 auction, but testified their return would not 100% satisfy Defendant's debt in light of the possible decrease in the price of the cows or the chance that Defendant would not return all of the cows. Even with all this information, Mr. Filhart still permitted Defendant to bid on cows at the March 27 auction.

Plaintiff, however, places great emphasis on the uncontradicted testimony from Mr. Filhart that Defendant approached him only minutes before the start of the auction. Plaintiff correctly argues that in certain circumstances a creditor need not investigate a debtor's statements. Plaintiff further contends that nothing in the circumstances here indicated Defendant was lying or was not trustworthy. Yet, justifiable reliance "takes into account the knowledge and relationship of the parties themselves." *Finnegan*, 428 B.R. at 456. The circumstances of this case show that even though Plaintiff had knowledge that Defendant failed to pay an earlier

26

debt owed to it, Plaintiff still extended further credit and did not prohibit Defendant from bidding or limit Defendant's purchases. It is unclear how Mr. Filhart claims he would not have permitted Defendant to bid at the March auction if he had known of Defendant's loan denial when Defendant testified without contradiction that he informed Mr. Filhart at some point before this auction that he could not get a loan and wished to return the cows purchased in January. Mr. Filhart's relationship with Defendant, both the successful repayment of the December 2008 auction debt and the failure to pay the January 14 auction debt, provided Plaintiff with "special knowledge" or "experience" that Plaintiff was simply unjustified in ignoring. *See Weeber v. Boyd (In re Boyd)*, 322 B.R. 318, 326 (Bankr. N.D. Ohio 2004) (creditor "had special knowledge of the [d]ebtor's financial situation and the possibility of nonpayment" because creditor had previously loaned the debtor money that was not repaid).

Justifiable reliance depends on the "'individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.'" *Willens v. Bones (In re Bones)*, 395 B.R. 407, 432 (Bankr. E.D Mich. 2008) (quoting *Field*, 516 U.S. at 72). The knowledge that Plaintiff obtained through the facts observed by both Mr. Filhart and Ms. Neyer cuts against a finding of justifiable reliance. Here, Mr. Filhart "'ha[d] discovered something which should serve as a warning that'" all was not as it seemed. *Id.* (quoting *Field*, 516 U.S. at 71). Defendant had failed to pay previously, told Mr. Filhart he could not secure a loan, and offered to return the cows; thus, any statements regarding loan approval clearly were questionable. "[A] plaintiff 'is required to make an investigation of his own' 'where, under the circumstances, the

27

facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived.'" *Brown*, 442 B.R. at 601 (quoting *Field*, 516 U.S. at 71). Although Mr. Filhart may have had less time than he, in hindsight, would have preferred to make the decision, his decision to permit Defendant to bid indicates he determined it was beneficial to have Defendant bid at the auction with the corresponding risk of Defendant's ability to pay. Again, justifiable reliance "'is a more subjective standard . . . that takes into account the interactions between and experiences of the two parties involved.'" *Boyuka v. White (In re White)*, 128 Fed. App'x 994, 999 (4th Cir. 2005) (quoting *Christian v. Justice (In re Justice)*, No. 01-02156, 2002 Bankr.LEXIS 1540, at *12 n. 3 (Bankr. N.D. Ohio Dec. 27, 2002)). The interactions and experiences surrounding the March 27 auction do not support justifiable reliance.

In summary, although Plaintiff justifiably relied on Defendant's representations with respect to the January 14 auction, subsequent interactions and the special knowledge gained by Plaintiff before the March 27 auction precludes a finding that Plaintiff justifiably relied on Defendant's representations at that auction.

E. *Attorney Fees*

Plaintiff's Complaint also sought to have all attorney's fees determined to be dischargeable. At trial, the Court stated that it did not believe that attorney's fees could be determined non-dischargeable under Section 523(a), but left open the possibility of such a determination if in fact Plaintiff prevailed. In light of its finding that Plaintiff has failed to meet several elements on which it has the burden of proof, the Court need not decide this issue.

28

<u>CONCLUSION</u>

The Court concludes that Plaintiff has not met his burden on all the elements so as to except Defendant's debt from discharge under 11 U.S.C. § 523(a)(2)(A). The Court directs counsel for Defendant to prepare and submit an Order consistent with this Opinion.

**Signed on March 28, 2011**

                                    **/s/ Daniel S. Opperman**
                              **Daniel S. Opperman**
                              **United States Bankruptcy Judge**

29